IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KAYLA GRIESHEIMER, | ) | Case No. 3:25-cv-02461-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I. Introduction

Plaintiff, Kayla Griesheimer ("Griesheimer"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Griesheimer's applications for DIB and SSI be affirmed.

## II. Procedural History

Griesheimer filed for DIB on December 1, 2023, alleging a disability onset date of September 1, 2022. (Tr. 241, 248). Her claims were denied initially and on reconsideration. (Tr. 131-41; 144-58). She then requested a hearing before an ALJ. (Tr. 159-60). Griesheimer (represented by counsel) and a vocational expert ("VE") testified before the ALJ on August 27,

2024. (Tr. 42-77). On December 19, 2024, the ALJ issued a written decision finding Griesheimer not disabled. (Tr. 14-36). The Appeals Council denied her request for review on September 17, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Griesheimer timely filed this action on November 13, 2025. (ECF Doc. 1).

## III. Evidence

### A. Personal, Educational, and Vocational Evidence

Griesheimer was 29 years old on the alleged onset date, making her a younger individual according to Agency regulations. (*See* Tr. 34). She graduated from high school. (*See id.*). In the past, she worked as a Parts Clerk, Claims Clerk, and a Motor Vehicle Assembler. (*Id.*).

### B. Relevant Medical Evidence[1]

On February 21, 2023, Griesheimer attended a follow up appointment with Robin Morgan Lanford, M.D., at Full Circle Care in Greenwood, South Carolina after a stroke-like incident. (Tr. 450-51). Repeat CT of her head and MRI were negative. (*Id.*). Griesheimer reported a past medical history of bipolar disorder, among other findings. (*Id.*). Dr. Lanford noted Griesheimer had an appointment for depression and anxiety with David Simons, PA, at Western Psychiatric on February 28, 2023.[2] (Tr. 453). On March 6, 2023, Griesheimer treated with Reid Castellone, M.D., for follow up after the stroke-like incident. (Tr. 443). Dr. Castellone noted a history including bipolar disorder, and that she had been out of her mental health

---

[1] Greisheimer only takes issue with the ALJ's consideration (or lack thereof) of her mental health limitations. (*See* ECF Doc. 6). Accordingly, I limit my review of the medical evidence to only those mental health records available in the transcript; any argument as to physical limitations is deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

[2] Greisheimer did not attend the February 28 visit with PA Simons; the first visit appears to be on March 16, 2023. (*See* Tr. 440-43).

medications before the incident. (*Id.*). Dr. Castellone indicated potential for conversion disorder and prescribed olanzapine 5 mg daily and duloxetine 60 mg daily with a referral to psychiatry. (Tr. 443, 445-46).

On March 16, 2023, Griesheimer had a new patient visit with PA Simons to treat for bipolar disorder. (Tr. 440). She reported being institutionalized three times in 2019 and 2020 with attempted suicide. (*Id.*). On examination, she was alert and jittery, with pressured speech, anxious mood, and some loosening of association. Tr. 441-42). She denied suicidal and homicidal ideation, denied auditory and visual hallucinations, but had some paranoia. (Tr. 442). Insight and judgment were fair. (*Id.*). Griesheimer reported doing well on Vraylar, but she could not afford the medication without insurance; she was currently on Zyprexa but reported it was not working well. (*Id.*). PA Simons started a trial of Risperdal and recommended follow up in two weeks. (*Id.*).

On April 4, 2023, Griesheimer followed up with PA Simons. (Tr. 438). On examination, she was oriented in all spheres, with normal speech, organized and logical thought process, and was tearful but with congruent mood and affect. (*Id.*). She had no suicidal or homicidal ideation, no paranoia, and no delusions noted. (*Id.*). Her insight and judgment were good. Tr. 439). PA Simons increased Risperdal to 2 mg at bedtime and recommended follow up in four weeks. (*Id.*).

At follow up with PA Simons on April 27, 2023, Griesheimer reported doing better and having more stable moods while on Risperdal. (Tr. 432). She reported having one four-hour crying spell but no other outbursts. (*Id.*). On examination, she was oriented in all spheres, with normal speech, organized and logical thought process, and had some anxiety but congruent mood and affect. (*Id.*). She had no suicidal or homicidal ideation, no paranoia, and no delusions noted.

(*Id.*). PA Simons continued Risperdal 2 mg at bedtime, and recommended Griesheimer continue gabapentin and Cymbalta as prescribed, with follow up in three months. (Tr. 433).

On July 25, 2023, Griesheimer followed up with PA Simons, reporting that she planned to move back to Ohio, where she had Medicaid and could live with her friend. (Tr. 410). On examination, she was oriented in all spheres, with normal speech, organized and logical thought process, and had congruent mood and affect. (Tr. 411). She had no suicidal or homicidal ideation, no paranoia, and no delusions noted. (*Id.*). Her insight and judgment were good. (*Id.*). PA Simons continued Risperdal 2 mg at bedtime, and recommended Griesheimer continue gabapentin and Cymbalta as prescribed; he wrote the prescriptions for 90 days and did not schedule follow up due to her move out of state. (Tr. 411-12).

On August 31, 2023, Griesheimer attended an appointment with Jami Blackburn, APRN-CNP, and reported she needed her mental health medications adjusted. (Tr. 751). Griesheimer reported she received weekly telehealth therapy with Terry Heits. (Tr. 752). On examination, she had dysphoric mood, was nervous and anxious, but was negative for agitation and confusion. (Tr. 754). She was alert in oriented in all spheres, with normal speech, behavior, thought content, and judgment. (Tr. 755). CNP Blackburn assessed Griesheimer with panic disorder; bipolar 1 disorder, current episode mixed, moderate; borderline personality disorder, and PTSD. (Tr. 755-56). CNP Blackburn placed a referral for psychiatry and prescribed Celebrex 200 mg. (Tr. 757).

On September 11, 2023, Griesheimer established care with Amanda Saunders, FNP-BC, for medication management of her bipolar disorder, borderline personality disorder, PTSD, panic disorder, and ADHD. (Tr. 1244-45). On examination, Griesheimer appeared to be within normal limits, with euthymic mood and congruent affect; intact cognition, with Griesheimer demonstrating good memory, attention, and concentration. (Tr. 1244). NP Saunders noted that

Griesheimer "exhibited no signs of significant cognitive or functional impairment." (*Id.*). She continued Griesheimer on her current medications and ordered Genesight testing. (Tr. 1245).

On September 19, 2023, Griesheimer returned for follow up with NP Saunders regarding Genesight testing to determine genetic responses affecting medication outcomes. (Tr. 1242-43). NP Saunders noted Griesheimer had trialed and failed several SSRIs, and therefore needed a more appropriate treatment plan. (Tr. 1243). On examination, Griesheimer again appeared to be within normal limits, with euthymic mood and congruent affect; intact cognition, with Griesheimer demonstrating good memory, attention, and concentration, and no signs of significant cognitive or functional impairment. (Tr. 1242). NP Saunders continued all medications at this visit, with a plan for Griesheimer to return in a week to discuss medication changes after obtaining results from the Genesight testing. (Tr. 1243).

At an October 12, 2023, follow up appointment with NP Saunders, Griesheimer reported that she was taking once daily Celebrex and had stopped risperidone. (Tr. 1237). On examination, Griesheimer again was within normal limits, with euthymic mood and congruent affect; intact cognition, with Griesheimer demonstrating good memory, attention, and concentration, and no signs of significant cognitive or functional impairment. (*Id.*). NP Saunders discontinued Vraylar due to too much excitability and started Depakote 125 mg, and started Seroquel as needed for sleep. (Tr. 1238). NP Saunders also instructed Griesheimer to taper Cymbalta and start Pristiq. (*Id.*). NP Saunders recommended follow up for an office visit in two weeks, with the expectation that the results from Genesight would be available and medication changes made. (*Id.*).

On October 19, 2023, Griesheimer followed up with NP Saunders. (Tr. 1235). She reported prednisone had caused severe mania and requested medication changes in response.

(*Id.*). On examination, Griesheimer again appeared to be within normal limits, with euthymic mood and congruent affect; intact cognition, with good memory, attention, and concentration, and no signs of significant cognitive or functional impairment. (*Id.*). NP Saunders started Griesheimer on Depakote 125 mg, continued Seroquel as needed for sleep, tapered Cymbalta slowly and added Pristiq 25 mg as tolerated. (Tr. 1236). NP Saunders continued this same course at the November 13, 2023 visit. (Tr. 1233-34).

On November 22, 2023, Griesheimer reported to NP Saunders that she was having difficulty obtaining her prescriptions through her pharmacy, and that the Seroquel was not working well for her sleep. (Tr 1230). Examination results were within normal limits. (*Id.*). NP Saunders provided instruction on tapering Cymbalta, and continued Pristiq 25 mg daily, as the Genesight results indicated Griesheimer was likely to receive more benefit from this medication. (Tr. 1231). NP Saunders also provided a letter of medical of medical necessity for Griesheimer's continued use of Caplyta, to treat her bipolar disorder. (Tr. 1231).

At a December 4, 2023 visit with NP Saunders, Griesheimer reported feeling depressed and that she had no support systems. (Tr. 1228). Examination results were within normal limits, with euthymic mood and congruent affect and mood. (*Id.*). NP Saunders continued Seroquel for sleep as needed and started Pristiq 25 mg daily, once prior authorization was approved by insurance, and recommended follow up in four weeks. (Tr. 1229).

On January 29, 2024, Griesheimer met with NP Saunders for medication management. (Tr. 2115). She reported that she had been unable to obtain Qulipta or Lybalvi filled because the pharmacy was waiting for prior authorization; she also requested to stay on low dose Naltrexone from NP Saunders, because pain management was unable to obtain approval for Contrave. (*Id.)*. Griesheimer reported that her pain interfered with her mental health, that she had continued

weight gain, and experienced debilitating migraines once or twice a week. (*Id.*). NP Saunders increased Pristiq to 50 mg daily, started Amovig, continued low dose Naltrexone, and refilled all other routine medications, with a recommendation to follow up in three months. (Tr. 2116).

On April 16, 2024, Griesheimer reported to NP Saunders that she was having increased anxiety of 6/10 and depression of 7.5/10, but had no suicidal or homicidal thoughts; she had weaned off gabapentin completely, and requested a refill of Buspar. (Tr. 2113-14). Griesheimer reported she slept most of the day after dropping her children off at school. (Tr. 2113). NP Saunders recommended obtaining labs from St. Rita's and putting Griesheimer on a weight loss plan, with potential to assess for possible GLP prescription, reordered Buspar, and increased Lybalvi, with recommendation to follow up in two weeks. (Tr. 2114).

On May 16, 2024, Griesheimer met with NP Saunders and reported lessened anxiety of 5/10 and that she was not feeling depressed. (Tr. 2110). NP Saunders increased Lybalvi to 20 mg and recommended follow up in one month. (Tr. 2111).

On June 14, 2024, Griesheimer met with NP Saunders and reported she was under a lot of stress, with worsening depression. (Tr. 2106). She also reported taking prednisone for a rheumatoid arthritis ("RA") flare and was worried that the medications would send her into a bipolar mania. (*Id.*). NP Saunders continued Lybalvi 20 mg, refilled all routine medications, and increased Trulicity to 1.5 mg subcutaneous weekly, with a note that Griesheimer was tolerating it well. (Tr. 2107).

### C. Medical Opinion Evidence

#### 1. State agency reviewing opinions

On January 25, 2024, State agency reviewing psychiatrist Amy Johnson, Psy.D., opined at the initial level that Griesheimer was moderately limited in her ability to maintain attention

and concentration for extended periods; to respond appropriately to changes in the work setting; and in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods; she found Griesheimer not significantly limited in all other areas. (Tr. 84, 95). Dr. Johnson noted that Griesheimer could interact appropriately at various appointment settings as well as in daily functioning (*Id.*). Dr. Johnson did not include any mental health limitations in her RFC opinion. (*See* Tr. 83-85; 95-96).

At the reconsideration level on March 16, 2024, State agency reviewing psychiatrist Deryck Richardson, Ph.D., found that the administrative findings from the initial level were consistent with and supported by the overall evidence, although he noted that there was insufficient evidence between the potential onset date of August 26, 2022 and the established onset date of June 11, 2023. (Tr. 109, 121). He affirmed Dr. Johnson's findings and added no mental health limitations to the RFC opinion. (Tr. 108-09; 120-21).

### 2. Treating mental health providers

On August 15, 2024, NP Saunders completed a mental residual functional capacity questionnaire. (Tr. 2126-30). In it, she notes that she treated Griesheimer for bipolar I, PTSD, borderline personality disorder, and ADHD, mainly through telehealth visits beginning on September 11, 2023. (Tr. 2126). She opined that Griesheimer was completely precluded from performing in a regular work setting in the areas of understanding, remembering, and carrying out detailed instructions; maintaining attention for two-hour segments; maintaining attendance; completing a normal workday without interruption from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest breaks; accepting instructions and responding appropriately to criticism from supervisors; getting along

with coworkers or peers without unduly distracting them; traveling to unfamiliar places; or setting realistic goals or making plans. (Tr. 2128-29). She opined Griesheimer would be limited more than 20% of an 8-hour workday in the areas of carrying out short and simple instructions; sustaining an ordinary routine without special supervision; working in coordination with others; making simple work-related decisions; asking simple questions or requesting assistance; and interacting appropriately with the general public. (*Id.*). All other areas she opined Griesheimer would be limited 11-20% of an 8-hour workday. (*Id.*).

NP Saunders described that Griesheimer's anxiety worsens her perception of pain and working would greatly increase anxiety to the point of panic attacks and potential hospitalization. (Tr. 2129).

**D. Administrative Hearing Evidence**

On August 27, 2024, Griesheimer testified before the ALJ. (Tr. 44). At the outset of the hearing, the ALJ noted that there were outstanding medical records from four sources, from the time period of 2022 until the hearing. (Tr. 47). Records from Full Circle to Completion were among those missing. (*Id.*). In response to the ALJ's question regarding whether there were still outstanding records, Griesheimer's counsel stated, "At this point we have a complete record, Your Honor." (*Id.*). The ALJ proceeded to question Griesheimer. (Tr. 48).

Griesheimer testified that she had last worked for about five months as a parts specialist. (Tr. 49). She stated that she would pick parts and bring them to the mechanic, as long as the part was under 20 pounds. (Tr. 50). She could not do any heavy lifting due to her RA, so her coworker would lift and carry the parts that weighed more than 20 pounds. (*Id.*). Before that job, she had built and installed parts on Army tanks but took short term disability during that period due to psychosis that had lasted for some time. (*Id.*). In this job, she worked on an assembly line

at her own workstation and also lifted up to 20 pounds. (Tr. 50-51). In 2019, she had worked as a warranty administrator to enter claims in a computer system. (Tr. 51-52). This was a sedentary job where she worked at a desk and did not need to lift or carry anything more than five pounds. (Tr. 52).

Griesheimer testified that she lives in a mobile home with her two children and has no significant other. (Tr. 55-56). She does not have a driver's license and will have her mom or a friend drive her around. (Tr. 54). She cannot afford public transportation, and did not access the Medicaid cab service. (Tr. 55). She can button, zip, use the TV remote, and use a knife and fork. (Tr. 61-62). She can go to the grocery store, and can ask for help while there, but the walking is difficult for her, so she takes short trips. (Tr. 58-59). She can do household chores, but it takes her a long time, and she often needs breaks due to swelling. (Tr. 56). Her knees, ankles, and hands will swell, and she also has issues with her hips and back. (*Id.*). She spends much of her day sleeping because of depression, but will also take her dog out, read, and watch TikTok videos. (Tr. 56-57). She is involved in her children's education but can't take them to the zoo or other activities. (Tr. 61).

Griesheimer treats with a psychiatrist, Amanda Saunders, who prescribes her both psych and general medications. (Tr. 59). Dr. Saunders had recently increased Griesheimer's anti-psychotic medication. (Tr. 59-60). She also has weekly telehealth visits with a therapist. (Tr. 59-60). She has anxiety, depression, bipolar type one, and PTSD. (Tr. 60-61). Her anxiety is fear-based and makes her feel like she's jumping out of her skin, and she has trouble focusing and staying on task. (Tr. 60). With her depression, she sleeps a lot and ignores things that need taken care of. (Tr. 60-61). If she has extra stress, she can go into a psychosis and start seeing things. (Tr. 61). She had last seen something three weeks before when she was under financial stress.

(*Id.*). She also has a panic disorder and will have daily panic attacks lasting for 30-45 minutes. (Tr. 65-66). She has issues being around large groups of people and will only leave the house if she has to, such as for appointments. (Tr. 66). She will "keep a really low profile to keep [her] mental health in check." (*Id.*).

Griesheimer had visited the emergency department three times in the last year, for stomach issues, potential ulcerative colitis, and migraine with aura that presented as a stroke. (Tr. 60). She had not had any psychological emergency room visits in the last year. (*Id.*).

She was about to start therapy for her back, and previously had surgery on her right knee. (Tr. 62). She takes Symbicort daily for her asthma and has a rescue inhaler which she uses about once or twice a week. (Tr. 64). She takes Anjovy, a once-monthly injection, for migraines. (*Id.*). She still gets bad migraines about once a week and will take ibuprofen to take the edge off and rest in a private, quiet location on those days. (Tr. 64-65).

The VE then testified. (Tr. 70). She classified Griesheimer's past work as Parts Clerk, DOT #222.367-042, SVP 3, heavy, but performed at light; Title Claims Clerk, DOT #241.387-010, SVP 4, sedentary as classified and as performed; and Assembler, Motor Vehicle, DOT #806.684-010, SVP 2, medium as classified, but performed at light. (Tr. 70-71).

The ALJ presented the following hypothetical, asking the VE to consider a hypothetical individual of Griesheimer's age, education, and past work experience, who could perform light work, but never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, crouch, kneel, stoop, and crawl; can frequently handle and feel and finger with the bilateral upper extremities; can frequently push and/or pull with the bilateral lower extremities; the individual can have occasional concentrated exposure to extreme cold, heat, and humidity; and occasional exposure to concentrated levels of dust, fumes, odors, gases, poor ventilation, and other

pulmonary irritants; and occasional exposure to extreme noise as set forth in the Dictionary of Occupational Titles; the individual cannot work around unprotected heights or operate heavy machinery, but can occasionally perform any occupational driving; the individual can perform simple and detailed work tasks as well as maintain attention during the performance of those duties; can use judgment necessary for the performance of their work duties, respond appropriately to usual work situations, and deal with changes in the work setting; can have occasional interaction with the general public and coworkers, with no limitations as it relates to interaction with supervisors, but with the general public and coworkers, the individual's interaction could be superficial in nature, defined as the ability to be in the proximity of others and the ability to exchange greetings and engage in casual conversation, although work-related interactions should be of a short duration for a specific purpose of just work-related exchanges. (Tr. 71-72). The VE testified that the individual could not perform Griesheimer's past work, but could perform the following light jobs: Routing Clerk, DOT #222.687-022, SVP 2, with 123,200 jobs nationally; Price Marker, DOT #209.587-034, SVP 2, with 42,450 jobs nationally; and Photocopy Machine Operator, DOT #207.685-014, SVP 2, with 6,000 jobs nationally. (Tr. 72-73).

The ALJ then modified the first hypothetical to include that the individual can engage in simple tasks but not at a production rate pace such as required working on an assembly line; can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable, predictable, and short-cycle; and adapt to occasional changes in a routine work setting. (Tr. 73). The VE responded that this modification would not change any of the jobs previously identified, nor would it impact the number of positions. (*Id.*).

The VE testified that an employer would not tolerate someone who is off-task ten percent or more on a consistent basis due to symptomology. (Tr. 73-74). In addition, an employer provides a 10-15 minute rest break every two hours, with a longer break at the midpoint of a shift; these breaks are expected to cover the employee's needs for using the telephone, going to the bathroom, taking medication, and any kind of rest the employee needs. (Tr. 74). Any breaks in addition to that standard would be an accommodation and not competitive employment. (*Id.*). With respect to absenteeism, an employer will permit seven to ten days per year before terminating an employee for absenteeism. (*Id.*).

In response to questioning by Griesheimer's attorney, the VE responded that if the hypothetical individual were limited to only occasional interactions with supervisors during the probationary period, they would not be able to complete the probationary period. (Tr. 76).

## IV. The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2. The claimant engaged in substantial gainful activity during the following periods: July 2022 through December 2022 (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4. The claimant has the following severe impairments: obesity; rheumatoid arthritis; fibromyalgia; right knee osteoarthritis, status-post remote right knee arthroscopy; and psychological conditions variously described as: ADHD, borderline personality disorder, bipolar disorder, major depressive disorder, and post-traumatic stress disorder (PTSD). (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs, crouch, kneel, stoop, and crawl. With the bilateral upper extremities, she can frequently handle, finger, and feel. With the bilateral lower extremities, she can frequently push and/or pull. She can have occasional concentrated exposure to extreme cold, heat, and humidity as well as occasional exposure to concentrated levels of dust, fumes, odors, gases, poor ventilation, and other pulmonary irritants. She can have occasional exposure to extreme noise as set forth in the Dictionary of Occupational Titles (DOT). She cannot work around unprotected heights or operate heavy machinery. She can occasionally perform any occupational driving. The claimant can engage in simple tasks but not at a production rate pace such as required working on an assembly line. She can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable, predictable, and short cycle and adapt to occasional changes in a routine work setting. She can have occasional interaction with the general public and coworkers. There are no restrictions in interacting with supervisors. Further, with the general public and co-workers, the claimant's interaction should be superficial in nature defined as the ability to exchange greetings and engage in casual conversation although work-related interactions should be of short duration for a specific purpose such as work-related exchanges.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on May 18, 1993, and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a). 12. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-35).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;
2. if not, whether the claimant has a severe impairment or combination of impairments;
3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;
4. if not, whether the claimant can perform their past relevant work in light of his RFC; and
5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI. Discussion

Griesheimer brings two issues for this Court's review: First, whether the ALJ provided adequate explanation as to her ability to interact with supervisors, and second, whether the ALJ developed the record sufficiently to provide her a full and fair hearing in light of the gap in evidence to support her counseling treatments. (ECF Doc. 6, p. 1).

### A. The ALJ sufficiently explained her division of social interaction, including whether Griesheimer was able to interact with supervisors.

Griesheimer first argues that the ALJ's social interaction limitations were arbitrary and not substantially supported where she limited Griesheimer to only occasional interactions with coworkers and the public but did not explain why there were no limitations on her ability to interact with supervisors. (*Id.* at p. 7). As Griesheimer asserts, distinguishing the types and length of interaction between these groups of people conflicts with the ALJ finding that she had moderate limitations in the ability to interact with others. (*Id.* at pp. 7-8). For Griesheimer, this amounts to harmful error, because if she were limited to only occasional interaction with supervisors, she would not be able to complete a probationary period in competitive employment. (*Id.* at p. 9). She further argues that the ALJ's RFC findings of "'occasional' interactions that are "'superficial' in nature and of 'short duration'" are in conflict. (*Id.* at pp. 9-10). In all, Griesheimer states that these conflicts constitute harmful error and frustrate meaningful review. (*Id.* at pp. 10-11).

The Commissioner, however, states that substantial evidence supports the ALJ's mental RFC findings, and that the ALJ provided sufficient rationale to explain her decision. (ECF Doc. 7, pp. 10-11). The Commissioner argues that an ALJ does not err by failing to define categories of people a claimant can interact with in an RFC, and even so, the ALJ described reports in which Griesheimer was cooperative with medical providers, as well as her self-reporting that she

got along well with authority figures. (*Id.* (quoting Tr. 24-25)). As the Commissioner points out, the ALJ provided both a qualitative and a quantitative limitation on the type of social interactions in Griesheimer's RFC, making any argument regarding this distinction meritless. (*Id.* at p. 12).

The Commissioner has the right of it here.

I first note that Griesheimer attempts to place this argument in Step Five of the sequential evaluation, where the ALJ has the burden to prove there is work in the national economy for a person with Griesheimer's RFC. (*See* ECF Doc. 6, p. 7 ("These error [*sic*] are not harmless as they impact the support for the ALJ's step five finding."); *and* p. 11 ("the ALJ's determination and step five finding lack substantial support and this error warrants remand")). This attempt to shift the burden to the ALJ is misplaced. Rather, Griesheimer's argument is founded squarely in challenging the RFC determination itself, and does not attack ALJ's support for the existence of work in the national economy for someone with Griesheimer's RFC. *See* 20 C.F.R. § 404.1512(a). I decline to construe this issue as a Step Five error.

Before proceeding to Step Four of the sequential analysis, the ALJ is required to assess the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. Walton v. Astrue, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996)). An ALJ must consider all relevant evidence in the case record, including a claimant's severe and non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a).

Here, the ALJ made the following RFC determination:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20

> CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs, crouch, kneel, stoop, and crawl. With the bilateral upper extremities, she can frequently handle, finger, and feel. With the bilateral lower extremities, she can frequently push and/or pull. She can have occasional concentrated exposure to extreme cold, heat, and humidity as well as occasional exposure to concentrated levels of dust, fumes, odors, gases, poor ventilation, and other pulmonary irritants. She can have occasional exposure to extreme noise as set forth in the Dictionary of Occupational Titles (DOT). She cannot work around unprotected heights or operate heavy machinery. She can occasionally perform any occupational driving. The claimant can engage in simple tasks but not at a production rate pace such as required working on an assembly line. She can make judgments on simple work and respond appropriately to usual work situations where duties are generally stable, predictable, and short cycle and adapt to occasional changes in a routine work setting. **She can have occasional interaction with the general public and coworkers. There are no restrictions in interacting with supervisors. Further, with the general public and co-workers, the claimant's interaction should be superficial in nature defined as the ability to exchange greetings and engage in casual conversation although work-related interactions should be of short duration for a specific purpose such as work-related exchanges.**

(Tr. 26 (emphasis added)). The ALJ explained that Griesheimer's "mental health impairments result in no more than moderate mental limitations. These are accommodated by the assessed residual functional capacity with restrictions on work complexity, pace, changes, and interpersonal interactions." (Tr. 33-34). The ALJ considered the state agency reviewers' opinions that Griesheimer required no mental RFC restrictions, despite having moderate limitations in maintaining attention, concentration, and pace. (Tr. 33). The ALJ explained that Griesheimer's testimony stating she had "difficulty interacting with large groups" was "not fully supported by the record." (*Id.*). As a result, the ALJ found that Griesheimer was moderately limited in all areas of mental health functioning, but that the above RFC appropriately accommodated these limitations. (*Id.*). On this basis, therefore, the RFC is supported by substantial evidence, and the ALJ sufficiently explained her reasoning.

With respect to the quantity and quality of social interactions, the Sixth Circuit has determined that an "occasional" limitation in an RFC is "not inconsistent" with a psychologist's

opinion that a claimant requires a “superficial” limitation. *See Reeves v. Comm’r’ of Soc. Sec.*, 618 F. App’x 267, 275 (6th Cir. 2015); *see also Haahr v. Comm’r of Soc. Sec*., No. 3:23-CV-02159-JRK, 2024 WL 3813772, *12 (N.D. Ohio July 3, 2024), *report and recommendation adopted as modified*, No. 3:23 CV 2159, 2024 WL 5242214 (N.D. Ohio Dec. 30, 2024). Nevertheless, district courts within the Sixth Circuit remain divided on the meaning of “occasional” and “superficial” interactions. *Haahr,* 2024 WL 3813772, at *12. Courts in this District have pointed out “there is no definition for the term ‘superficial interaction’ in the Dictionary of Occupational Titles.” *Johnson v. Comm’r of Soc. Sec.*, No. 1:22-cv-02272, 2023 WL 8283922, at *15 (N.D. Ohio Nov. 9, 2023) (citations omitted), *report and recommendation adopted*, 2022 WL 8281461 (N.D. Ohio Nov. 30, 2023); *Burley v. Comm’r. of Soc. Sec.,* No. 4:23-CV-00218, 2024 WL 1297554, *6, (N.D. Ohio March 27, 2024) (“The Court declines to adopt our sister District's approach distinguishing superficial and occasional interaction.”); *James v. Comm’r. of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 417932, *20 (N.D. Ohio June 5, 2023). But sister courts appear to have adopted a vocational term of “superficial” interactions, “which definition is presumed to be qualitatively inconsistent with ‘occasional’ interactions.” *Stephen D. v. Comm’r. of Soc. Sec.,* No. 1:21-CV-00746, 2023 WL 4991918, *7 (S.D. Ohio August 4, 2023), *report and recommendation adopted*, S.D. Ohio No. 1:21-CV-7462024 WL 2204735; *see also, e.g.*, *William H. v. Comm’r of Soc. Sec.*, No. 3:21-cv-219-CHG, 2022 WL 4591304, *4-6 (S.D. Ohio Sept. 30, 2022) (ALJ made reversible error by dismissing “superficial” as lacking vocational definition, despite district precedent defining the term relative to social interactions); *Crisp v. Comm’r of Soc. Sec.*, No. 2:19-cv-2401-MHW-CMV, 2020 WL 581841, *3-4 (S.D. Ohio Feb. 6, 2020) (reversing based on ALJ’s “inadequate” rejection of “superficial interactions” as “somewhat ambiguous”).

Rather than follow the Southern District of Ohio's approach that distinguishes between superficial and occasional interaction, this Court aligns with those from this District that have remained true to the precedent established by *Reeves*. The fact the ALJ used the phrase "occasional" rather than "superficial" interaction with a claimant's supervisors does not draw a distinction void of explanation, and is harmless error. *Haahr,* 2024 WL 3813772, at *12.

But even if this Court did not follow *Reeves*' precedent, the ALJ has provided social interaction limitations in both quantitative and qualitative terms. The ALJ described "occasional interaction with the general public and coworkers" and that interaction should also "be superficial in nature defined as the ability to exchange greetings and engage in casual conversation although work-related interactions should be of short duration for a specific purpose such as work-related exchanges." (Tr. 26). The ALJ placed no restrictions on interactions with supervisors. (*Id.*). Further, the ALJ provided both qualitative descriptions such as having superficial interactions like greetings and casual conversation; and quantitative descriptions such as short duration for a specific purpose. (*Id.*). Thus, any argument that the ALJ failed to appropriately describe the social interactions in quantitative and qualitative terms is unfounded..

As described above, the relevant inquiry is whether the facts demonstrate that the RFC assessment is supported by substantial evidence. *Johnson*, 2023 WL 8283922, at *1 (citing *Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020). The ALJ's decision sufficiently explains its rationale and cites to substantial evidence in support. I find no error, and therefore do not recommend remand on this issue.

**B. The ALJ did not fail to properly develop the record**

Griesheimer next argues that the ALJ failed to adequately inquire and request record evidence regarding Griesheimer's weekly therapy appointments, which would support NP Saunders' medical opinion. (ECF Doc. 6, p. 11). Griesheimer acknowledges that both her representative and the Agency failed to obtain the records from her weekly counseling sessions, yet contends that it "should have triggered the ALJ to develop the record." (*Id.* at 12). She argues that even though she had representation, the ALJ's duty to develop the record was not met, requiring remand to ensure that adequate efforts are made, and assistance given, to obtain the record evidence. (ECF Doc. 9, pp. 1-2).

The Commissioner describes various attempts made to obtain the records from Full Circle to Completion, noting that Griesheimer provided different addresses in Lima and Toledo, Ohio, respectively; that the hearing office attempted to obtain records at the Lima address on December 21, 2023; her representative attempted at the Toledo address on July 12, 2024, and would continue to attempt by telephone, fax, and/or mail; and that during the August 27, 2024 hearing, her representative noted that there was a complete record; additional attempts made on September 6, 2024 and September 24, 2024; and that the Agency authorized a subpoena be sent after the hearing, and kept the record open an additional ten days for its return. (ECF Doc. 7, pp. 13-15 (citing Tr. 47, 67-69, 77, 387-88, 395, 400, 1218-23)). In all, the Commissioner states

plainly that Griesheimer has failed to show an error of law, and remand is not required on this issue. (*Id.* at p. 16).

Due process obliges the ALJ to ensure that every claimant receives a full and fair hearing.[3] *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (2008) (citing *Lashley v. Sec'y of HHS*, 708 F.2d 1048 (6th Cir. 1983)). As such, the ALJ is "a neutral factfinder," *Moats v. Comm'r of Soc. Sec*., 42 F.4th 558, 563 (6th Cir. 2022), charged with developing the facts. *Richardson v. Perales*, 402 U.S. 389, 410 (1971). But even though the ALJ must develop the facts sufficiently to ensure each claimant receives a full and fair hearing, the claimant has the ultimate burden of proving entitlement to benefits. *Moats*, 42 F.4th at 563 (quoting *Duncan v. Sec'y of Health & Hum. Servs*., 801 F.2d 847, 856 (6th Cir. 1986)) (citing 20 C.F.R. § 404.1512(a)).

With respect to obtaining medical evidence, such as treatment records, it is incumbent on the claimant to "inform [the Agency] about or submit all evidence known to you that relates to whether or not [they] are blind or disabled." 20 C.F.R. § 404.1512(a)(1). The evidence must be provided in full, and "must be complete and detailed enough to allow [the ALJ] to make a determination or decision about whether [the claimant is] disabled . . . ." *Id.* § 404.1512(a)(2). The Agency will make reasonable efforts to obtain a complete record. *Id.* § 404.1512(b)(i). In practice, this means that if it has not received the evidence within 10 to 20 days after making the initial request, it will "make **one** follow-up request to obtain the medical evidence necessary to make a determination" and give the medical source at least 10 calendar days to reply. *Id.* (emphasis added).

[3] A heightened duty for the ALJ to develop the record applies where the claimant is uncounseled, incapable of presenting an effective case, and unfamiliar with hearing procedures. *Wilson*, 280 F. App'x at 459. Greisheimer was represented by counsel at the hearing, (*e.g*., Tr. 42), making the ALJ's heightened duty to develop the record inapplicable.

The ALJ's finding that the record is inadequate to allow for proper evaluation of the evidence triggers the ALJ's duty to conduct an appropriate inquiry. *Strang v. Comm'r of Soc. Sec.,* 611 F. App'x 271, 276 (6th Cir. 2015). "To ensure that the ALJ has fulfilled [their] duty to conduct an appropriate inquiry, [they] 'should include documentation of all attempts to obtain the evidence an exhibit in the record.'" *Id.* (quoting Social Security Administration, Office of Hearings and Appeals, HALLEX 1–2–5–1, Evidence—General (2008)). Even so, such claims are subject to a harmless error analysis, and this Court will not remand unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the Agency's procedural error. *Rabbers*, 582 F.3d at 654.

Here, Griesheimer has failed to show that the ALJ did not meet their burden to develop the record, or that the Agency failed to meet its own regulations.

As the record reveals, both the Agency and the ALJ made significant efforts to obtain the records from Full Circle to Completion, and that Griesheimer's counsel indicated at two separate points that the records were unavailable:

- The hearing office attempted to obtain treatment records from Full Circle to Completion at 1727 Allentown Rd., Lima, OH, 45805, the address Griesheimer provided to the Agency. (*Compare* Tr. 309 *with* Tr. 1218-23).

- During the hearing, Griesheimer's counsel twice stated that the record was complete, despite the ALJ's inquiry specific to the Full Circle to Completion records. (Tr. 47, 77).

- After the hearing, Griesheimer's counsel noted that requests sent to Full Circle of Completion at 316 N. Michigan St., Toledo, OH, OH 43604, were returned to sender and that the phone number was no longer in service. (Tr. 395). Counsel requested that a subpoena be issued, but if no records were obtained, that the ALJ proceed to a decision. (*Id.*).

- After the hearing, counsel submitted a letter stating in relevant part:

  As for the remaining evidence, Full Circle to Completion, we have been unable to secure those records or make contact with the facility. It appears

> that the hearing office has also made an attempt to secure these records with no success. 3F. Accordingly, **we do not believe those records exist** to submit to Your Honor and we would not request the record be left open for those records. After submission of the Scripts 360 records on August 28, 2024, **we believe the record to be as complete [as] possible and ask that Your Honor proceed to a decision on this case.** (Tr. 400 (emphasis added)).

The Agency is required to make "reasonable efforts" to obtain the evidence indicated by the claimant – and it more than did so here. *See* 20 C.F.R. § 404.1512(b)(i). The Agency, and the ALJ, met their burden to develop the record and document the efforts made to obtain this evidence. Having apparently exhausted all available avenues to obtain the missing records, ALJ proceeded to decision after counsel represented at the hearing and thereafter that the record was complete and the records could not be obtained. The ALJ was not required to do more to meet this burden.

I find no error with the ALJ's handling of the record, and therefore recommend the District Court affirm.

## VII. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Griesheimer's applications for DIB and SSI be affirmed.

Dated: September 30, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).
under